UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
ANTHONY ZAPPIN,

Plaintiff,

- against -

MATTHEW F. COOPER,
KEVIN M. DOYLE,
LAUREN LIEBHAUSER,
HANNAH YU,
JANE DOE,

Defendants.

------------------------------------------------------------ X

Case No. _____

**COMPLAINT**

Jury Trial Demanded

Plaintiff Anthony Zappin ("Plaintiff") hereby brings this action under 42 U.S.C. § 1983

against Defendants Matthew F. Cooper, Kevin M. Doyle, Lauren Liebhauser, Hannah Yu and

Jane Doe[1] (collectively, "Defendants") alleging the following:

**THE PARTIES**

1.      Plaintiff Anthony Zappin was the Defendant in the retaliatory criminal action

captioned *People of the State of New York v. Anthony Zappin*, Case No. 2017NY019016

(hereinafter, "*People v. Zappin*"), initiated on March 28, 2017.  Plaintiff resides in West Virginia.

2.      Defendant Matthew F. Cooper was the complainant in the *People v. Zappin* matter.

Defendant Cooper was at the time a sitting Supreme Court Justice in New York County and had

presided over Plaintiff's personal divorce action *Anthony Zappin v. Claire Comfort*, Index No.

301568-2014 between 2015 and 2016.  Upon information and belief, Defendant Cooper is still a

Supreme Court Justice is New York County and maintains a professional address of 60 Centre

---

[1] Plaintiff does not know the name of Defendant Jane Doe at this time.  Plaintiff will seek to amend
the caption in this complaint once Defendant Jane Doe's name is learned either through the course of this
litigation or by other means.

Street, Part 51, New York, New York 10007.  Plaintiff brings this action against Defendant Cooper is his personal capacity as a Justice of the Supreme Court of the State of New York.

3.      Defendant Kevin M. Doyle was a staff attorney at the Attorney Grievance Committee for the First Judicial Department.  As set forth herein, Defendant Doyle materially assisted both Defendant Cooper and the members of the Manhattan District Attorney's Office in manufacturing evidence and criminal charges in the *People v. Zappin* matter.  Upon information and belief, Defendant Doyle is still a staff attorney at the Attorney Grievance Committee for the First Judicial Department and maintains a professional address of 180 Maiden Lane, 17th Floor, New York, NY 10038.  Plaintiff brings this action against Defendant Doyle in his personal capacity as an official of the State of New York.

4.      Defendant Lauren Liebhauser is a former senior detective and/or investigator for the Manhattan District Attorney's Office in New York City.  Upon information and belief, while working in the Manhattan District Attorney's Office she maintained a Shield or Badge Number of 175.  Defendant Liebhauser was the investigative officer in the *People v. Zappin* matter.  Detective Additionally, Defendant Liebhauser signed and filed the criminal complaint against Plaintiff Anthony on March 29, 2017, which contained materially false statements of fact.   Upon information and belief, Defendant Liebhauser maintained a professional address One Hogan Place, New York, NY 10013.  Further, upon information and belief, Defendant Liebhauser is currently employed as a New York Police Department Police Officer in Queens, New York.  Plaintiff brings this action against Detective Liebhauser in her individual capacity as an official of the Manhattan District Attorney's Office.

5.      Defendant Hannah Yu is an Assistant District Attorney in the Manhattan District Attorney's Office.  Defendant Yu was the ADA assigned to the *People v. Zappin* matter.  However,

as set forth herein, prior to filing charges against Plaintiff, Defendant Yu participated in and oversaw Detective Lauren Liebhauser's bogus investigation, which included attempts to manufacture evidence and charges against Plaintiff. Upon information and belief, Defendant Yu maintains a professional address One Hogan Place, New York, NY 10013. Plaintiff brings this action against Defendant Yu in her individual capacity as an official of the Manhattan District Attorney's Office.

6.     Defendant Jane Doe is some type of "Supervisor" in the Manhattan District Attorney's Office. Defendant Doe was Defendant Yu "supervisor" in the *People v. Zappin* matter. However, as set forth herein, prior to filing charges against Plaintiff, Defendant Doe participated in and oversaw, along with Defendant Yu, Detective Lauren Liebhauser's bogus investigation, which included attempts to manufacture evidence and criminal charges against Plaintiff. Upon information and belief, Defendant Yu maintains a professional address One Hogan Place, New York, NY 10013. Plaintiff brings this action against Defendant Yu in her individual capacity as an official of the Manhattan District Attorney's Office.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331 as this action arises out of the laws of the United States, namely 42 U.S.C. § 1983.

8.     Venue is proper in this Judicial District pursuant to 28 U.S.C §1391 because a substantial part of the events and/or omissions giving rise to the claims in this action occurred in this Judicial District.

## FACTUAL ALLEGATIONS

9.      In this action, Plaintiff brings claims under Section 1983 against Defendant Cooper and his co-conspirators in connection with the *People v. Zappin* matter. As explained

herein, Defendant Cooper used his position as a Justice of the Supreme Court of the State of New York to improperly influence the Manhattan District Attorney's Office to instigate and pursue a wholly baseless and frivolous misdemeanor criminal charge against Plaintiff in an effort to strip him of his liberty, to retaliated against Plaintiff for exercising his First Amendment right to speak out against Defendant Cooper and to ostensibly harass, torment and terrorize Plaintiff.  Defendant Cooper's instigation of bogus criminal charges against Plaintiff is only one chapter in his then ongoing two-year campaign of harassment, retaliation and bad faith litigation waged against Plaintiff, which included Defendant Cooper fabricating findings in the *Zappin v. Comfort* divorce proceeding in an effort to have Plaintiff disbarred and repeatedly engaging in extrajudicial conduct of leaking sealed documents to the *The New York*, *The New York Daily News* and *The New York Law Journal* in an effort to irreparably damage Plaintiff's personal and professional reputation. As explained more fully herein, however, Defendant Cooper's conduct in connection with the *People v. Zappin* matter  took his vendetta against Plaintiff way too far this time and without question crossed the line by orchestrating a situation that not only inflicted financial, reputational and emotional harm on Plaintiff, but also compromised Plaintiff's physical well-being and endangered his life.  Justice demand that Defendant Cooper and his co-conspirators be held accountable for his actions.

> A.   The State of Affairs Prior to the November 2, 2016 Incident

10.     The relevant facts of this case begin with a November 2, 2016 incident between Plaintiff and Defendant Cooper.  By way of background, at this point in time, Defendant Cooper had already issued a Judgment of Divorce in *Zappin v. Comfort* in August 2016 and there was no litigation taking place in front of him related to that suit.  However, Plaintiff had filed at least two complaints with the New York State Judicial Commission on Judicial Conduct against him for his

misconduct in *Zappin v. Comfort*, had written several letters to Defendant Cooper's supervisory judges, namely then Administrative Judge Peter Moulton and Chief Administrative Judge Lawrence Marks detailing Defendant Cooper's intemperate behavior and abhorrent conduct and most notably filed an action in this Court seeking to hold Defendant Cooper personally liable for his extrajudicial acts of personally disseminating a sealed decision in *Zappin v. Comfort* to the media that contained knowingly false and defamatory statements about Plaintiff in an effort to irreparable damage Plaintiff's personal and professional reputations.  *See Zappin v. Cooper*, Case No. 16-cv-5972 (S.D.N.Y.).

11.     Moreover, Plaintiff maintained several YouTube videos on the "ZappinvComfort" YouTube channel, which gained thousands of views, depicting Defendant Cooper making inappropriate, bigoted and intemperate remarks at Continuing Legal Education held by the New York Women's Bar Association.  Plaintiff also maintained videos from members of the public calling for Defendant Cooper's removal from the bench.  And, exercising his First Amendment rights, Plaintiff helped maintain two websites – www.justicematthewfcooper.com and www.removejusticematthewcooper.com – designed to bring public awareness to Defendant Cooper's misconduct with links to relevant documents and materials from numerous litigants abused by Defendant Cooper illustrating that he was without question unfit to remain on the bench. By way of example, these documents showed Justice Cooper making wholly inappropriate statements to the New York Assembly, providing kick-backs to attorneys in the form of "Attorney for the Child appointments" and refusing to disqualify himself in cases where his campaign manager was acting as an attorney.  These websites garnered thousands of hits per month and were routinely being used in court against Defendant Cooper by litigants in the matrimonial cases he presided over.

12.     All in all, the formal complaints, federal lawsuit, public YouTube videos indexed on Google and websites devoted to his removal from the bench were a mounting unmitigated disaster for Defendant Cooper's professional reputation and, upon information and belief, caused him to be passed over for promotions to the Appellate Division and out of the Matrimonial Part in New York County Supreme Court on at least two occasions.

13.     As discussed above, Defendant Cooper continued to attempt to do everything in his power to discredit Plaintiff, irreparably damage his reputation and suppress Plaintiff's legitimate exercise of his right to free speech.  Defendant Cooper's primary attack on Plaintiff consisted of using his influence as a Justice of the Supreme Court to instigated ancillary proceedings, such as disciplinary proceedings by the Attorney Grievance Committee (discussed *infra*) and enforcement threats by the Child Support Enforcement Unit, designed to deplete Plaintiff of the financial resources and ability to defend himself.  Moreover, Defendant Cooper's tactics included a failed effort to move for sanctions in the prior *Zappin v. Cooper* federal suit, cease and decease letters to YouTube and domain registrars, using the Attorney Grievance Committee to threaten additional disciplinary actions against Plaintiff and attacking individuals associated with Plaintiff, *e.g.*, upon information and belief, influencing court officials to demand that Plaintiff's friend Sebastian Doggart, who had covered the *Zappin v. Comfort* matter, have his press credential rescinded and be routinely harassed by court officers while observing family court proceedings.

14.     At this point in time, it was apparent that Defendant Cooper was becoming increasingly frustrated with Plaintiff's public criticism of him over his misconduct and repeated instances of intemperate and retaliatory behavior.  As Defendant Cooper himself whined in a March 27, 2017 order, discussed *infra*, that Plaintiff's exercise of free speech and his right to

petition had become "an undue distraction from [his] duties as a judge in the New York State Supreme Court matrimonial part."

    B.  <u>The November 2, 2016 Incident between Plaintiff and Defendant Cooper</u>

  15.  On the morning of November 2, 2016 between approximately 9:20 and 9:30 am, Plaintiff was walking south on Broadway in New York City.  Plaintiff was walking from the Staples store on the corner of Broadway and Ann Street back to his class at the Flatiron School located at 11 Broadway.[2]  At approximately 9:25 am, Plaintiff passed Defendant Cooper on the north east corner of Rector Street and Broadway, who was walking north on Broadway.  (*See* Ex. 1, Criminal Complaint.)  According to the criminal complaint, Defendant Liebhauser alleged that Plaintiff reported to the New York City Police Department that "Justice Matthew Cooper approached [Mr. Zappin] and spit on him."[3]  (*See id*.)

  16.  More specifically, according to the allegations in the criminal complaint, Plaintiff stated that "as he was walking southbound on Broadway … he heard someone say the 'F' word and that when he turned he saw Justice Matthew Cooper walking northbound on Broadway." (*See* Ex. 1, Criminal Complaint.)  It is alleged that Plaintiff further stated that "Justice Cooper appeared to be on the phone and that Justice Cooper moved the phone away from his mouth briefly." (*See id*.)  Finally, Defendant Liebhauser asserted that Plaintiff alleged that "he heard somebody make a spitting sound and that he then saw Justice Cooper run into the subway station." (*See id*.)

  17.  After Defendant Cooper passed him, Plaintiff took out his phone and snapped a series of photographs of Defendant Cooper running and/or briskly walking across the street in the direction of the Wall Street subway station

---

[2] Plaintiff was taking an intensive computer programming bootcamp course at the Flatiron School to refresh his computing programming skills in hopes of finding a job as a computer programmer until the issues with Defendant were resolved.

[3] Plaintiff contests Defendant Liebhauser's characterization of Plaintiff's report to the NYPD.






(Ex. 2, Zappin November 2, 2016 Photos of Cooper.)  While taking the photographs, Plaintiff's phone died and he then resumed walking south to the Flatiron School.  Once Plaintiff arrived at the Flatiron School, a fellow student pointed out a large wet spot on the front of Plaintiff's sweater. (*See* https://www.youtube.com/user/anthonyzappin/.)  Plaintiff immediately took photographs of his sweater:

 

(*See* Ex. 3, Zappin November 2, 2016 Photos of Sweater.)  It was at this point that Plaintiff recalled possibly hearing someone "spit" while walking past Defendant Cooper and believed that Defendant Cooper, a man who has previously changed Plaintiff to a physical altercation or "rumble" in open court during the *Zappin v. Comfort* proceeding, could have very likely spit at him.

18.     After taking the photographs of his sweater, Plaintiff then spoke with his parents and separately with his matrimonial counsel via cellphone about the incident.  On advice of both

his parents and his counsel, Plaintiff walked to the NYPD 1st Precinct between approximately

12:00 pm and 1:00 pm on November 2, 2016 to make a report to document the incident with

Defendant Cooper.  Plaintiff and his parents thought that it was important to document the incident

for multiple reasons, but most importantly because of the history between Plaintiff and Defendant

Cooper and the fact that Defendant Cooper is a compulsive and habitual liar who has a documented

history of fabricating allegations and assertions about Plaintiff, including making false claims to

have Plaintiff's Secure ID revoked, as well as threatening to physically assault Plaintiff.

19.     When Plaintiff arrived at the NYPD 1st Precinct to file his report concerning the

incident, Plaintiff reiterated Defendant Cooper's abusive history towards Plaintiff.  As reflected in

the actual police report filed by NYPD Police Cadet Nicasio Kadyr, "C/V [Zappin] IS FILING

REPORT TO DOCUMENT THE INCIDENT."  (*See* Ex. 4, Police Report.)  The Police Report

demonstrates that Plaintiff never sought to prosecute Defendant Cooper, but rather filed the police

report on advice of his parents and counsel in order to document what happened to avoid later false

allegations by Defendant Cooper.   Plaintiff reiterated these concerns to Defendant Liebhauser in

his January 3, 2017 call with her.  (*See* https://www.youtube.com/user/anthonyzappin/.)  Plaintiff

never once requested that the NYPD or the District Attorney's Office prosecute Defendant Cooper.

Rather, he stated to Defendant Liebhauser during the January 3, 2017 telephone call that he just

wanted Defendant Cooper to "leave him alone." (*See id.*)  Unfortunately, Defendant Cooper only

escalated his campaign of harassment towards Plaintiff upon learning of the police report.

C.     Detective Lauren Liebhauser and the District Attorney's Office

20.     After Plaintiff filed the police report on November 2, 2016 with NYPD Police

Cadet Nicasio Kadyr, Plaintiff never initiated contact with anyone in the NYPD to follow-up on

the report.  As stated above and reflected in the police report, Plaintiff was only documenting the

incident to prevent subsequent false allegations against him by Defendant Cooper.  Likewise, Plaintiff was never contacted by anyone in the NYPD about the police report.  In other words, not a single NYPD officer, detective or anyone otherwise associated with the NYPD reached out to Plaintiff to investigate Plaintiff's police report.  For all intents and purposes, the matter was a closed case for the NYPD.

21.     Upon information and belief, Defendant Cooper used his influence as a sitting Justice of the Supreme Court to have the case re-opened, so to speak.  In the course of two months, Plaintiff's police report went from being filed by a NYPD Cadet and never followed up by anyone at the NYPD to being escalated all the way up to the most senior investigator in the District Attorney's Office, Defendant Liebhauser.  At this point, it became apparent that the Manhattan District Attorney's Office was attempting to manufacture a retaliatory criminal case against Plaintiff at the behest of Defendant Cooper.

22.     Nearly two months after the incident, Defendant Liebhauser reached out to Plaintiff via e-mail.  (*See* Ex. 5, Liebhauser Communications.)   In that e-mail, Defendant Liebhauser stated:

> Mr. Zappin
> I recently left you messages asking for you to call me.  You filed a complaint at the 1st precinct on 11/02/2016 and I would like to follow up with you on that.  Please call me as soon as possible.  If I am unable to speak with you soon this matter will be closed due to lack of cooperation on your part.

(*See id*.)  This was the very first communication from an investigator or police officer Plaintiff received concerning his November 2, 2016 police report against Defendant Cooper.  As what would become clear later, Defendant Liebhauser continued to pressure Plaintiff with threats that the case would be closed if Plaintiff did not cooperate, even though Plaintiff repeatedly reiterated that he did not wish to pursue charges against Defendant Cooper.

23.     Plaintiff spoke with Defendant Liebhauser on the phone on January 3, 2017.  The call can be heard here: https://www.youtube.com/user/anthonyzappin/.  Plaintiff reiterated his story on the call as set forth above.  He further reiterated that he did not want to pursue charges against Defendant Cooper and that he only wanted to be left alone by the man.  Apparently, Defendant Yu and Defendant Doe were listening in on the call, something which Defendant Liebhauser failed to inform Plaintiff of during the call.

24.     After the call, Detective Liebhauser began to hound Plaintiff for his photographs that he took on November 2, 2016 as well as other documents.  (*See* Ex. 5, Liebhauser Communications.)  Again, she threatened to "close [the] investigation" if Plaintiff did not provide them, even though Plaintiff was not seeking to press charges.  (*See id*.)  Upon information and belief, Defendants Yu and Doe directed Defendant Liebhauser to sent this e-mail.  On advice of counsel, namely J. Richard Supple,  Plaintiff provided Defendant Liebhauser his photographs and the requested documents on January 21, 2017.  (*See id*.)  Plaintiff had no further communications from Defendant Liebhauser until early March 2017.  Notably, Detective Liebhauser never once requested the sweater Plaintiff was wearing, which may have contained Defendant Cooper's spit.

25.     In early March 2017, Defendant Liebhauser called Plaintiff stating that they had obtained a video of the incident.  She requested that Plaintiff come into the station to verify what occurred on the video.  Defendant Liebhauser further stated that she could not send Plaintiff the video because it was "evidence."  Plaintiff told her that he was in West Virginia and could not come in to see the video.  Plaintiff further stated that he would try to let her know if and when he would be back in New York.  Upon information and belief, Defendants Yu and Doe were on this call without Plaintiff's knowledge.  Plaintiff had no further communications with Detective Liebhauser until March 28, 2017 when Plaintiff was arrested by her.

     D.    <u>Plaintiff's Lawsuit Against Defendant Cooper in New York County<br>Supreme Court</u>

26.    Although Plaintiff did not wish to pursue criminal charges against Defendant Cooper, on advice of counsel, namely J. Richard Supple, Plaintiff filed a civil action against Defendant Cooper in New York County Supreme Court on February 24, 2017 concerning the November 2, 2016 incident.  The suit received substantial press coverage in Law360 and on AboveTheLaw.com.  However, Plaintiff never actually served the lawsuit on Defendant Cooper so as to not interfere with post-judgment motions in *Zappin v. Comfort* then pending before Defendant Cooper in early 2017.  Moreover, Plaintiff was becoming weary of J. Richard Supple's advice as his counsel, which consisted of directing Plaintiff to filed *pro se* lawsuits against Justice Cooper and other state officials to try to "make something happen" to request a stay in the attorney disciplinary proceeding initiated against Plaintiff by Defendant Doyle using Defendant Cooper's falsified findings in *Zappin v. Comfort*.

     E.    <u>Defendant Cooper's Recusal from *Zappin v. Comfort*</u>

27.    Out of the blue on March 27, 2017, Defendant Cooper issued a *sua sponte* order recusing himself from *Zappin v. Comfort*.  At that time, several post-judgment matters were pending before him.  None of the post-judgment motions requested Defendant Cooper's recusal.[4]

28.    Defendant Cooper's March 27, 2017 recusal order was without question bizarre. For example, Defendant Cooper complained that the *Zappin v. Cooper* matter pending in this Court had "become an undue distraction from [his] daily duties as a judge in a New York State Supreme Court matrimonial part."  (*See* Ex. 6, Cooper Recusal Order.)  Defendant Cooper further grumbled that Plaintiff "filed two complaints against [him] with the New York State Commission on Judicial

---

[4] Defendant Cooper's March 27, 2017 recusal order states that Plaintiff had made demands "as recently as [the] week [prior]" requesting his recusal.  (*See* Ex. 6, Cooper Recusal Order.)  This statement was unequivocally false.

Conduct." (*See id*.)  And, in true hypocritical fashion, Defendant Cooper whined that Plaintiff "launched at least two websites aimed at smearing [him]."  (*See id*.)  Apparently it is okay for Defendant Cooper to defame Plaintiff in numerous published decisions and tabloid articles solicited by him all around the Internet, but two piddly websites responding to Defendant Cooper's abusive actions constitute "maleficent playbook."

29.     Even more shocking was the fact that Defendant Cooper made numerous false, completely baseless and outright bizarre allegations against Plaintiff – many of which Plaintiff was hearing for the first time in the recusal order – as a justification for his recusal.  For instance, Defendant Cooper wrote:

> First, he somehow located my son's email address and identified his employer. Then, either posing as his father … or having his father act at his behest, he sent a disturbing message to my son late at night.  He compounded this incredibly transgressive act by posting a fake on-line review of a course my son teaches.  In that posting he stated "his father is corrupt New York mobster Judge Matthew Cooper."

(Ex. 6, Cooper Recusal Order.)  These allegations were never raised at any point prior to issuing the recusal order. Plaintiff and his father have never had any contact with Defendant Cooper's family or son.  Indeed, much like his findings in the *Zappin v. Comfort* Sanctions Decision and Child Custody Decision, Defendant Cooper's assertions are fabrications created for apparent dramatic purposes without a shred of evidence to support them.  They only serve to confirm that fact that Defendant Cooper is a habitual and compulsive liar.

30.     Similarly, Defendant Cooper further fabricated alleged acts by Plaintiff in the recusal order.  He goes on to write:

> The breaking point, so to speak, has come with an email that was sent to me at 12:31 a.m. on Saturday, March 18, 2017.  Without detailing the disturbing barrage of personal and professional attacks aimed at me, it is safe to say that this message goes well beyond the usual hyperbolic claims and accusations contained in his pleadings, emails, and other communications.

(Ex. 6, Cooper Recusal Order.)   Again, this was another unmitigated fabrication by Defendant Cooper.   Plaintiff never sent him any e-mail on Sunday March 18, 2017 or at any other point. Indeed, Defendant Cooper never disclosed what the purported contents of the e-mail were, as such an e-mail no doubt does not exist.

31.     In reality, the purported "breaking point" requiring his recusal from *Zappin v. Comfort* was nothing but a lie.   Indeed, the real reason that Defendant Cooper recused himself from *Zappin v. Comfort* was because he knew Plaintiff was going to be arrested the next day on baseless charges stemming from the November 2, 2016 incident and that he would be the complaining witness.   Defendant Cooper's propensity to lie and fabricate know no limits.

F.     Plaintiff's March 28, 2017 Arrest Instigated by Defendant Cooper

32.     On March 28, 2017, Plaintiff was attending a hearing in *Zappin v. Comfort* before Judge George Jurow in New York County Family Court concerning modification of custody of the parties' child.   At the conclusion of the proceeding at approximately 12:30 pm, Judge Jurow informed Plaintiff and his counsel (Peter Lomtevas) that there were law enforcement officers outside in the hallway.   As Plaintiff attempted to exit the courtroom, he was met by Defendant Liebhauser, an unknown female detective and two unknown male detectives.   They immediately grabbed Plaintiff, slammed him with extreme force against the wall face first and handcuffed him. They further confiscated his property including his cell phone, laptop and USB drives.   Plaintiff was then given a "perp walk" from the New York County Family Court Courthouse to the District Attorney's Office at One Hogan accompanied by four detectives.   During that time, Plaintiff made no statements to the detectives.

33.     When Plaintiff arrived at One Hogan, he was placed in a small approximately 6' x 4' cell where he remained for several hours.   He was denied the ability to use the bathroom and

was refused water.  Plaintiff was forced to watch Defendant Liebhauser sit behind a desk typing on her computer and texting on her cell phone.  The only statements Plaintiff directed at Detective Liebhauser during his confinement in the cell was to ask what he was being charged with, to ask to speak with his attorney and provide her his attorney's number, to ask to use the bathroom and to ask for water.  Some time later, Plaintiff was informed he was being charged with making a false police report under N.Y. Penal Law 240.50(3)(a) with respect to his police report filed concerning the November 2, 2016 incident with Defendant Cooper.  Defendant Liebhauser, on the other hand, repeatedly directed questions to Plaintiff, which he mostly refused to answer without his attorney present.  The only question Plaintiff answered was with respect to his employment and to inform Detective Liebhauser that he was supposed to begin a new job the following day on March 29, 2017.

34.     After Plaintiff was booked and processed, Defendant Liebhauser took him to the "Tombs," the holding cells in the New York City Criminal Courthouse, for holding until he could be arraigned at approximately 3:00 pm.  Plaintiff was again placed in another holding cell.  The holding cell had feces smeared all over the cell.  It had no running water or functioning toilet.  And, Plaintiff was denied food and water for the entirety of his stay in the Tombs.

35.     Despite the fact that Plaintiff's paperwork was ready for arraignment that evening and that the Court conducted arraignments until midnight, Plaintiff was held overnight.  Indeed, Plaintiff saw approximately two dozen inmates who were placed in the Tombs after him go up from arraignment on the evening of March 28, 2017.  Upon information and belief, Plaintiff's papers were deliberately held back by the District Attorney's Office so that he would be forced to spend the night in the Tombs in an effort to harass and terrorize him.  During that night, there were no places to sleep in the holding cells, which were packed with inmates charged with rape, gun

crimes, malicious assault and serious drug offenses.  Plaintiff was forced to stay up all night both because there was no place to sleep and for fear of being robbed or assaulted while he was asleep.

36.     Plaintiff was finally taken up to another holding cell near the courtroom at approximately 7:00 am on March 29, 2017.  This time, Plaintiff was packed into a cell approximately 10' by 8' with over 30 other inmates awaiting arraignment.  There were no benches to sit on in the cell.  There was no running water.  And, the toilet did not function and was covered in urine and feces that would not flush.  After enduring deplorable conditions for over twenty-four hours, Plaintiff was finally called for his arraignment at approximately 12:30 pm on March 29, 2017.  Indeed, the District Attorney's Office deliberately kept Plaintiff detained the full twenty-four hours prior to arraigning him as a means of harassing, terrorizing and inflicting emotional distress on him.[5]

### G.     Plaintiff's Unlawful and Retaliatory Bail Hearing and Detention

37.     Prior to being brought before Judge Phyllis Chu for arraignment, Plaintiff spoke with a public defender who was representing him at the arraignment.  The public defender told Plaintiff that he would be released on his own recognizance without bail because of the fact that he had no prior criminal history, it was a minor misdemeanor charge and that Plaintiff was an attorney who had an apartment in Manhattan.  This is precisely what Plaintiff was told when he was going through booking by Defendant Liebhauser and other officers.  Plaintiff was told that assessment made by the District Attorney's Office was to recommend that Plaintiff be released on his own recognizance.  Furthermore, after reading the criminal complaint, the public defender called the District Attorney's Office "stupid" and "silly" for bringing the charges, even noting that

---

[5] *See* http://manhattanda.org/criminal-justice-system-how-it-works?s=38 ("In New York City, defendants are usually brought before a judge of the Criminal Court of the City of New York for arraignment within 24 hours of arrest.")

Defendant Liebhauser seemingly admits in her sworn complaint that Plaintiff could have made a mistake.

38.     When the arraignment proceeding began, Plaintiff and the public defender were blindsided. First and foremost, Defendant Liebhauser fabricated purported statements made by Plaintiff during the arrest that were reiterated on-the-record by the Assistant District Attorney at the arraignment:

> The People are requesting a temporary order of protection and serving statement notice that on March 28, 2017, at approximately 12:35 p.m., inside 60 Lafayette Street, the defendant stated in substance in the presence of Investigator Liebhauser … see you in Federal Court. You should know that I reported [recorded] all of our phone calls. On March 28, 2017, at approximately 2:15 p.m. inside 100 Centre Street, the defendant stated in substance to Investigator Liebhauser, the only other time I have ever been arrested was relating to Claire in Massachusetts.

(Ex. 7, Transcript of Arraignment.) Multiple witnesses – including Plaintiff's matrimonial counsel (Peter Lomtevas) who followed Plaintiff out of the courthouse during the arrest – never heard Plaintiff speak a single word to Defendant Liebhauser. Thus, Defendant Liebhauser's assertions that Plaintiff "would see her in Federal Court" and that he "recorded all of [their] calls" were unequivocally false. This is further confirmed by the fabricated statement by Detective Liebhauser that Plaintiff stated "the only other time [he has] ever been arrested was relating to Claire in Massachusetts." Plaintiff has never been arrested in relation to anything involving Claire Comfort, much less in Massachusetts where Plaintiff and Ms. Comfort have never been simultaneously. Again, Detective Liebhauser's statements were a complete and utter fabrication. Detective Liebhauser's fabricated statements were an abuse of process and a fraud on the court. It only illustrated the bad faith, harassing scheme underlying the charge brought against Plaintiff.

39.     Then, matters only got worse. The District Attorney's Office demanded a $5,000 bail for Plaintiff – an absolutely unheard of amount for a first offense misdemeanor, particularly

one that is non-violent.  The District Attorney's Office reasons for the excessive bail only served

to confirm the retaliatory nature of the charges and the bail request itself:

> The People are requesting bail in the amount of $5,000 be set in this case.  The defendant, a lawyer, who represented himself in a divorce proceeding that presided over in party by Supreme Court Justice Matthew Cooper is a resident of West Virginia and has the mean to travel outside of New York.  This is a troubling case in which the defendant made a false police report with the New York City Police Department, alleged that Defendant Cooper sit on him.  ***Video footage from the vicinity of the alleged location show both the judge and the defendant walking by the judicial commission building without incident.***
>
> The defendant further claimed, in a purported phone call with the district attorney officer's senior investigator Lauren Liebhauser, that he did not see the judge actually spit on him, but rather that he heard a spitting sound and then saw Judge Cooper run across the street and head into a subway station.  Phone records from Judge Cooper's phone shows he was on the phone for approximately 14 minutes, beginning at 9:25 a.m., establishing that the judge maintained phone service for 14 minutes after passing by the judicial commission building.[6]
>
> ***The defendant had a history of making false report against others.  He has claimed in the past that another Supreme Court Judge, Judge Deborah Kaplan ordered a court officer to unlawfully imprison him.  He is also claiming the same court officer assaulted him.  The defendant's false reporting against Defendant Cooper was used as a basis for letters to supervising judges with OCA, as well as the commission of judicial conduct in which he states Defendant Cooper physically assaulted and harassed him.  The defendant has also sued Defendant Cooper in State Court for the same spitting incident***, and is clearly retaliating against the Justice for rendering an unfavorable decision in the divorce proceeding, and for sanctioning the defendant.[7]

(Ex. 7, Arraignment Transcript (emphasis added).)  Plaintiff exercising his right to petition the

government for redress is not a statutory factor for determining bail in New York.  *See* N.Y.

Criminal Procedure Law 510.30.  More importantly, Plaintiff's arrest and unlawful bail was clearly

retaliatory based on the Assistant District Attorney's statements set forth above.  First, the

---

[6] Defendant Cooper could have been standing in the subway station talking on his cell phone for the 14 minutes.

[7] The Assistant District Attorney also stated that Plaintiff had "filed false allegations against the Attorney for the Child and his ex-wife's counsel and had threatened them with lawsuits" at the arraignment hearing.  However, it appears those statements were omitted from the transcript.

Assistant District Attorney stated that Plaintiff had filed "false reports" against Justice Kaplan and Officer Katz.  There was never a determination as to the merits of Plaintiff's Court of Claim allegations.  Upon information and belief, it was Defendant Cooper who lied to Defendant Liebhauser and the District Attorney's Office (including Defendants Yu and Doe) stating that Plaintiff's Court of Claims allegations were false.  Regardless, the fact that Plaintiff's Court of Claims action against Justice Kaplan was used as a (unlawful) basis for seeking bail only confirms the retaliatory nature of the criminal charge.  Second, the Assistant District Attorney confirmed that the criminal charges and unlawful bail were retaliatory as a result of Plaintiff filing complaints against Defendant Cooper with the Office of Court Administration.  Again, Plaintiff's complaints were an exercise in free speech.  Thirdly, and most importantly, the Assistant District Attorney confirmed that the criminal charge and unlawful bail request was in retaliation from Plaintiff's unserved civil suit filed against Defendant Cooper concerning the November 2, 2016 incident.  It was all but apparent that Defendant Cooper instigated the charges for the collateral purposes of retaliating against Plaintiff filing complaints and legal actions against him as well as to avoid the potential for a civil suit against him.

40.     Plaintiff's counsel requested that he be released on his own recognizance.  He reiterated Plaintiff's lack of criminal history, the fact that Plaintiff had never missed a court appearance and that Plaintiff was residing in New York taking computer coding classes.  Despite these facts, Judge Chu imposed an unlawful and plainly retaliatory $2,500 bail on Plaintiff and immediately sent him to Riker's Island.

41.     Judge Chu further issued a temporary order of protection on behalf of Defendant Cooper.  There was never a stated basis for the order of protection.  Despite that fact, Judge Chu issued it as a "full stay away" order effectively precluding Plaintiff from accessing the courthouse,

once again infringing on his constitutional rights.  Upon information and belief, the Defendant Yu requested the temporary order of protection, at the behest of Defendant Cooper, in an effort to force Plaintiff to remove the two websites dedicated to Defendant Cooper's misconduct.

H.   Plaintiff's Horrifying and Retaliatory Trip to Riker's Island

42.   Immediately after the arraignment, Plaintiff was taken to another holding cell and segregated by himself awaiting transport to a detention facility.  At this point, Plaintiff thought that he would be transferred to the Manhattan Detention Complex as someone was waiting to post his bail.  However, Plaintiff later learned that he was segregated and isolated "off-book" to be placed on a bus to Riker's Island.   As a consequence, the person waiting to post Plaintiff's bail was turned away because Plaintiff could not be located.   Upon information and belief, this "unique" treatment was directly influenced by Defendant Cooper and the District Attorney's Office.  More importantly, Plaintiff was constantly monitored by the same corrections officer who appeared to be assigned specifically to him.

43.   Plaintiff waited for several hours in his cell alone while awaiting transport.  During that time, Plaintiff was again denied water and food.  At this point, Plaintiff had not had food or water in well-over 24 hours.  He was also denied access to the phone to call his family and friends.

44.   When Plaintiff was finally taken out of the cell several hours later, he was shackled, handcuffed and led to a bus by the same officer who had been monitoring him in the cell.  Plaintiff's handcuffs and shackles were placed on him so tight that they nearly broke his wrists and cut off his circulation.  When Plaintiff asked that they be adjusted, the officer laughed at him.  Furthermore, it was at this point Plaintiff learned he was being taken to Riker's Island. When Plaintiff asked the officer why he was being taken to Riker's Island instead of the Manhattan Detention Complex, the officer responded with:  "That's what happens when you fuck with a

judge, bitch." Once again, the officer's statement made clear that Plaintiff's off-book isolation and the direction that he be taken to Riker's Island was orchestrated and done by Defendant Cooper and the Manhattan District Attorney's Office (*e.g.*, Defendant Yu and Defendant Doe).

45.     The treatment singling Plaintiff out continued on the transport bus. While the handful of other inmates were placed on benches on the bus with their handcuffs over their lap, Plaintiff was placed in a cage the size of a high school locker and forced to sit on his hands that were cuffed behind his back. In fact, Plaintiff nearly broke his wrists having to sit on his hands while on the bus. Upon information and belief, Plaintiff was handcuffed and shackled in such a manner by the unknown officer to deliberately inflict pain and discomfort on him.

46.     Plaintiff was driven around on the bus for hours before reaching Riker's Island. In fact, Plaintiff was the last inmate on the bus dropped off. During this time, Plaintiff's family repeatedly attempted to post bail, but were rebuffed stating that they could not post bail because Plaintiff had not been processed and that he was "still on the bus." When Plaintiff finally reached his destination and the officer who had handcuffed him left the bus to go into the correctional facility, the bus driver saw Plaintiff writhing in pain from being forced to sit his handcuffed hands. The bus driver re-arranged Plaintiff's cuffs so they were over his lap. He further stated that Plaintiff should go to the infirmary because his wrists looked broken and that "they aren't supposed to cuff you like that."

47.     Plaintiff was finally taken into a correctional facility at Riker's Island sometime on the evening of March 29, 2017. However, he was placed in another holding cell where he waited for hours to be "processed." During this time, Plaintiff's family could not post bail because they were being told that he had not been "processed" yet. Again, the cell was covered in feces with old food laying all over the floor. Rats were persistently running end-to-end in the cells

picking up food.  There was no running water or functioning toilet.  Plaintiff was forced to lay down on a bench that was less than one-foot-wide as it was the first rest he had gotten in over 24 hours.

48.     Throughout the evening, Plaintiff was shifted from one holding cell to another. Each cell was exactly the same.  There was no running water or functioning toilet.  Scraps of food and feces covered the floor.  Prior to reaching his final holding cell, Plaintiff was swapped between eleven different holding cells.  Never once was he given water or food.

49.     Most troubling was the fact that as Plaintiff was being shuffled between holding cells for no apparent reason, he was given khakis and a name-tag.  On the name-tag, it stated "Anthony Zappin, Religion: Jewish."  Plaintiff had not told anyone his religion at any point during the arrest or incarceration.  When Plaintiff asked the officer why they put "Jewish" on his nametag, he stated that it was "in his paperwork."  Plaintiff does not advertise the fact that he is Jewish, but Defendant Cooper knew as a result of the proceedings in *Zappin v. Comfort*.  Upon information and belief, Defendant Cooper communicated either directly or through the Manhattan District Attorney's Office (*e.g.*, Defendant Yu and/or Defendant Doe) to corrections at Riker's that Plaintiff was Jewish.  Upon information and belief, this information was passed to corrections so as to make Plaintiff a target within Riker's Island for an assault and/or other hate crime.  Indeed, placing the word "Jewish" on Plaintiff's name-tag was like placing a giant bull's eye on Plaintiff's back inside Riker's Island.

50.     At some point in the early morning hours of March 30, 2017, Plaintiff was taken to the infirmary.  It took over five hours to be evaluated.  While in the infirmary, Plaintiff was still not considered "processed" and his family could not post bail despite their attempts to do so.  In the infirmary, Plaintiff experienced some of his scariest moments in confinement.  Plaintiff

informed the medical doctors that he was taking the Emsam patch (an MAOI Inhibitor) for depression.   However, the doctors and nurses proscribed him Prozac (an SSRI), which is contraindicative with Emsam.   In fact, mixing MAOI Inhibitors and SSRI's can be deadly. Plaintiff repeatedly warned the doctors, nurses and corrections officers on the potential deadly interaction, but they screamed and threatened him forcing him to take the Prozac.  They further took multiple vials of Plaintiff's blood without his consent.  The doctor's refused to give Plaintiff his other necessary medications.

51.     By Plaintiff's best estimate, he was released from the infirmary somewhere around 5:00 am on March 30, 2017.  At this point, Plaintiff had still not been fed or given water.  He had still not been given access to a phone to call his family and friends.  Indeed, Plaintiff had been deliberately secreted or "lost" inside Riker's Island.  This was apparent by the fact that Plaintiff was not placed in population like every other inmate after being processed out of the infirmary. Rather, Plaintiff was taken to a 6' by 6' cell without a bed, sink or toilet where he was housed for the remaindered of his time at Riker's Island prior to his family posting bail.

52.     When arriving to the 6' x 6' cell, Plaintiff immediately collapsed on the floor in exhaustion and fell asleep.  When he woke up, Plaintiff had been joined by another inmate, despite other cells being free.  The inmate was extremely violent and had been arraigned on March 28, 2017 where he threatened to defecate on the presiding judge.   After he woke up, Plaintiff immediately realized that he was soaked in urine from the other inmate urinating on the floor as the cell did not have a toilet.  The corrections officers refused to allow Plaintiff to change his khakis leaving Plaintiff in urine soaked clothing for the remainder of his stay in Riker's Island.

53.     At approximately 2:00 p.m. on March 30, 2017, Plaintiff was informed that his family was finally able to post bond.  However, Plaintiff was not immediately removed from the

cell.  Instead, Plaintiff was left to remain there until approximately 6:00 pm, where he was taken

back to the original holding cells he was held in before he was processed.  Plaintiff waited there

until the morning of March 31, 2017 when he was finally released.  At that point, Plaintiff had still

never been given food or water.  When Plaintiff's belongings were returned to him, all of Plaintiff's

cash, credit cards and apartment keys has been stolen. As mentioned above, Plaintiff's cell phone

and laptop had been confiscated by Detective Liebhauser.  When Plaintiff was released, he was

given a MetroCard with two rides on it and dropped in the middle of Queens.  After several hours,

Plaintiff managed to make it back to Manhattan where he was able to locate a friend who helped

him contact his family.

54.     The entire bail proceeding and detainment was nothing short of tactics to torture,

humiliate and inflict emotional distress on Plaintiff by Defendant Cooper and his co-conspirators.

As described above, Plaintiff's entire stint at Riker's was irregular as it was deliberately designed

to thwart anyone from posting bail for Plaintiff and to keep Plaintiff confined and "off the books"

while detained.  Moreover, Plaintiff was repeatedly placed in situations where his safety and

physical well-being were in immediate jeopardy.  Indeed, it is Plaintiff's belief that the whole

ordeal was orchestrated by Defendant Cooper, the Manhattan District Attorney's Office and other

members of the New York Unified Court System not to simply scare Plaintiff, but to get Plaintiff

hurt or, even worse, killed in Riker's Island.  Plaintiff seriously believed that he was going to die

in Riker's Island.  Indeed, there is little doubt that Defendant Cooper exercised his influence to

orchestrate most, if not all, of the irregularities Plaintiff experienced while detained.

I.     Defendant Cooper's Request for an Order of Protection Was an Abuse of
       Process Intended to Thwart Plaintiff's Access to the Courthouse

55.     As mentioned above, during the arraignment proceeding, the New York City

Criminal Court issued a temporary order of protection against Plaintiff in favor of Defendant

Cooper.  Upon information and belief, Defendant Cooper affirmative requested that the Assistant District Attorney request and seek a temporary order of protection against Plaintiff.  As set forth below, Defendant Cooper requested the temporary order of protection to further harass Plaintiff and to fundamentally restrict Plaintiff's access to the courts and the courthouse.

56.     Prior to the November 2, 2016 incident, Plaintiff has <u>never</u> had any interaction with Defendant Cooper or anyone associated with Defendant Cooper outside of the proceedings in *Zappin v. Comfort*.  Nonetheless, the Assistant District Attorney requested the temporary order of protection at Defendant Cooper's behest.  During the arraignment proceeding, the transcript confirms that the Assistant District Attorney provided absolutely no basis as to why the temporary order of protection was necessary.  (*See* Ex. 7, Arraignment Transcript.)  Astonishing, the temporary order of protection required Plaintiff to "stay away" from Defendant Cooper's "business" and "place of employment."  (*See* Ex. 8, Cooper Temporary Order of Protection.)  In other words, Plaintiff was required to "stay away" from the New York County Supreme Court.

57.     The temporary order of protection fundamentally interfered with Plaintiff's right to access the court and the courthouse.  This is illustrated by post-judgment motion practice in *Zappin v. Comfort*.  In May 2017, Plaintiff filed *inter alia* a motion to modify visitation and custody based on Ms. Comfort's location of the child from New York, NY to Washington, DC in February 2017 without notifying Plaintiff or seeking permission of the matrimonial court.  A hearing was set by Justice Michael Katz on Plaintiff's motion for June 29, 2017.

58.     A few days before the hearing on Plaintiff's post-judgment motion, he received word that the New York County Court Officer's intended to arrest Plaintiff for violation of the temporary order of protection if he appeared at the June 29, 2017 hearing before Justice Katz.  As a result, Plaintiff wrote letters to Judge Katz requesting that he be granted permission to participate

by telephone pursuant to 22 NYCRR 202.10, particularly since Plaintiff was represented by counsel, and in order to not run afoul of the temporary order of protection. (*See* Ex. 9, Correspondence with Justice Katz and OCA.) Justice Katz refused Plaintiff's request and ordered his appearance at the hearing despite the fact that it would violate Defendant Cooper's temporary order of protection. (*See id.*) Plaintiff then wrote a letter to the Office of Court Administration explaining the situation and requesting that he be allowed to appear by telephone or that the temporary order of protection be clarified and/or excepted. (*See id.*) Plaintiff never received a response back from anyone at the Office of Court Administration.

59.     On June 29, 2017, Plaintiff did not appear at the hearing before Justice Katz on Plaintiff's post-judgment modification motions in order to avoid violating the temporary order of protection. Instead, Plaintiff appeared through counsel, Peter Lomtevas. Nonetheless, Justice Katz denied Plaintiff's motion as a result of Plaintiff refusal to appear at the hearing. Moreover, Justice Katz unlawfully modified Plaintiff's visitation with the child to make in even more draconian and favorable to Ms. Comfort by directing that Plaintiff's visitation with the child take place in Washington, DC. (*See* Ex. 10, June 29, 2017 Order from Justice Katz.) At minimum, Plaintiff was entitled to an evidentiary hearing as a result of Ms. Comfort unlawful relocation of the child in an effort to thwart his visitation. Regardless, Defendant Cooper's temporary order of protection coupled with the acts of Justice Katz and the Office of Court Administration fundamentally interfered with Plaintiff's right to be heard and his right to meaningful access to the courts. Indeed, the entire purpose of Defendant Cooper's request for a temporary order of protection was for precisely this collateral and improper purpose to frustrate Plaintiff's access to the courts and the courthouse.

J.  Defendant Cooper's Request for an Order of Protection Was an Abuse of Process Intended to Try to Trap Plaintiff with a Violation for the Two Websites or to Otherwise Scare Plaintiff into Removing Them

60.     As mentioned above, Plaintiff helped maintain to websites dedicated to Defendant Cooper's bad acts and corruption on the bench.  These websites were a continual sore sport for Defendant Cooper as he would repeatedly reference them in orders and during court proceedings.

61.     Upon information and belief, Defendant Cooper requested and demanded an order of protection in the *People v. Zappin* matter in an effort to eliminate the two websites.  Specifically, if the websites remained up, Defendant Cooper intended to allege that they were a violation of the order of protection.  Consequently, Plaintiff was forced to have them taken down to avoid any further bogus criminal proceedings brought against him.

62.     Regardless, Defendant Cooper's demand for an order of protection in the *People v. Zappin* matter had a clear collateral purpose of suppressing Plaintiff's protected First Amendment speech.  Along those same lines, Defendant Cooper's demand for an order of protection was an act of retaliation against Plaintiff for exercising his right to publicly criticize Defendant Cooper.

K.  Defendant Lauren Liebhauser's Misconduct During the Proceeding

63.     After Plaintiff was released on bail, it immediately became apparent at the hearing as the case progressed that the Defendant Liebhauser and the District Attorney's Office had conducted a one-sided investigation, were hiding evidence and that they had misrepresented the facts in charging Plaintiff.  First and foremost, it was learned that Defendant Liebhauser never even attempted to interview Plaintiff's classmates who had pointed out the spit on Plaintiff's shirt when he returned to class on November 2, 2017 after the incident with Defendant Cooper.  Similarly, Defendant Liebhauser and the District Attorney's Office refused to disclose who

Defendant Cooper was on the phone with when he passed Plaintiff on the street.  That person was a critical and key witness as to what happened.

64.    Most problematic was the purported video Defendant Liebhauser and the District Attorney's Office claimed to have that showed Plaintiff and Defendant Cooper passing the Judicial Commission building.  In Plaintiff's statements to Detective Liebhauser, Plaintiff stated that the incident took place north of the Judicial Commission Building.  (*See See* https://www.youtube.com/user/anthonyzappin/.)    Yet, in the criminal complaint, DefendantLiebhauser swore the following:

> I reviewed video footage from November 2, 2016 between the approximate hours of 9:00 am and 10:00 am from outside of 61 Broadway, which is where the New York State Commission on Judicial Conduct is located, and I observed the defendant and Defendant Cooper pass by the exterior of 61 Broadway without any encounter or interaction.

(Ex. 1, Criminal Complaint.)  Detective Liebhauser's above statements clearly have the import that the video depicts Plaintiff and Defendant Cooper walking past the Judicial Commission Building "without encounter or interaction" ***at the same time***.  Similarly, the Assistant District Attorney at the arraignment hearing stated the same:  "Video footage from the vicinity of the alleged location show both the judge and the defendant walking by the judicial commission building without incident."  (Ex. 7, Arraignment Transcript.)  Again, the clear import of this statement is that Plaintiff and Defendant Cooper walked by the Judicial Commission Building "without incident" ***at the same time***.  These statements were deliberate tacit misrepresentations, which were primarily used to orchestrate Plaintiff's unlawful stint in Riker's Island.

65.    After months of requests, the District Attorney's Office finally produced the video referenced in the criminal complaint.  It does not in any way demonstrate that Plaintiff filed a false police report against Defendant Cooper and instead corroborates Plaintiff's allegations.

Specifically, the video is from the exterior entrance security camera for the 61 Broadway Building where the Judicial Commission and the Attorney Grievance Committee are located.[8]  It shows Defendant Cooper walking northward on the street and Plaintiff walking southward on the same street approximately one minute and thirty-eight seconds later:





(*See* https://www.youtube.com/watch?v=6n7IGTwU9m8.)   It does <u>not</u> show Plaintiff and Defendant Cooper walking by the Judicial Commission Building at the same time as insinuated

---

[8] The video was apparently supplied by Defendant Doyle to the District Attorney's Office, discussed *infra*.

by Defendant Liebhauser in the criminal complaint and the Assistant District Attorney at the arraignment hearing.  In fact, the only thing the video does is confirms Plaintiff's account of the events that Plaintiff and Defendant Cooper passed each other north of the Judicial Commission Building.  Thus, Defendant Liebhauser wholly lacked probable cause to charge Plaintiff with making a false police report to the extent she relied on this video.

66.       What is even more troubling is the fact that Detective Liebhauser and the District Attorney's Office suppressed video footage that actually did show Plaintiff and Defendant Cooper passing on the street.  Specifically, in the photos Plaintiff took of Defendant Cooper running across the street after passing him, a New York DIR Traffic Camera is seen directly overhead:

 

(Ex. 2, Zappin November 2, 2016 Photos of Cooper.)  This video footage is regularly maintained by the NYPD and can be requested by law enforcement.  Furthermore, Defendant Liebhauser was aware of the footage based on the fact that Plaintiff had provided the cross streets in his original criminal complaint, had again provided the cross streets of the incident in his January 3, 2017 call

with her and had provided her the above photographs subsequent to the call.  Plaintiff made requests during the criminal proceeding for this footage, but was repeatedly ignored or met with assertions that the footage was irrelevant and "didn't show anything."

67.      Upon information and belief, this video footage was in the possession of Defendant Liebhauser and the District Attorney's Office.  Furthermore, upon information and belief, the video footage from the NYPD DIR Traffic Camera corroborated Plaintiff's account of the events on November 2, 2016 and was exculpatory of the charge that Plaintiff made a false police report.  Plaintiff believes that Defendant Liebhauser and the District Attorney's Office deliberately suppressed the video footage from the NYPD DIR Traffic Camera, which fundamentally infringed on Plaintiff's constitutional rights.

## L.      Defendant Kevin Doyle's Involvement in the Case

68.      As alluded to above, Defendant Cooper was the presiding judge in Plaintiff's personal divorce action, *Zappin v. Comfort*.  In that case, Defendant Cooper manufactured and fabricated findings of fact in a February 29, 2016 Child Custody Decision in the case that were subsequently used by Defendant Doyle to bring an unconstitutional "collateral estoppel" attorney disciplinary proceeding against Plaintiff.  Indeed, as evidence of scheme to inflict harm on Plaintiff, Defendant Doyle and the Attorney Grievance Committee actually assisted and consulted with Defendant Cooper in drafting the Child Custody Decision.

69.      With respect to the *People v. Zappin* matter, Defendant Doyle was a material co-conspirator in Defendant Cooper's quest to retaliate and inflict harm on Plaintiff with criminal action.  Upon information and belief, Defendant Doyle and Defendant Cooper had several conversations concerning whether Defendant Cooper should press criminal charges against

Plaintiff.  Indeed, both agreed that such a charge would bolster the collateral estoppel attorney disciplinary proceeding brought against Plaintiff by Defendant Doyle.

70.     With respect to the *People v. Zappin* matter and the collateral estoppel attorney disciplinary proceeding, Defendant Doyle repeatedly raised the arrest in the proceedings.  He did this for two reasons.  First, most obviously, Defendant Doyle – acting in conjunction with Defendant Cooper – raised the *People v. Zappin* matter as a way of impugning Plaintiff's character without have to prove any facts.  Second, and more importantly, Defendant Doyle made the bogus assertion in the collateral estoppel disciplinary proceeding that Plaintiff had filed a false police report against his ex-wife Claire Comfort in 2013 after she has viciously attacked and beaten him.  However, Defendant Doyle refused to produce an actual copy of the police report or allow Plaintiff an opportunity to defend himself against Defendant Doyle's false charge.  Rather, the *People v. Zappin* matter was filed by Defendant Cooper in conjunction with Defendant Doyle for the collateral purpose of bolstering Defendant Doyle's contention that Plaintiff had filed a false police report against Ms. Comfort.  Put another way, the collateral intent behind Defendant Cooper filing the *People v. Zappin* matter was to give Defendant Doyle evidence of a "pattern" of filing false police reports.  Thus, the *People v. Zappin* matter was essentially manufactured evidence to be used in the collateral estoppel disciplinary proceeding.

71.     To put it simply, Defendant Cooper in conjunction and consultation with Defendant Doyle filed the criminal complaint in *People v. Zappin* for the collateral purpose that the bogus criminal charge against Plaintiff be used in the collateral estoppel disciplinary proceeding against Plaintiff.

72.     It should be noted that Defendant Doyle materially participated in other aspects apart from consulting and conspiring with Defendant Cooper about filing the criminal complaint.

Specifically, it was Defendant Doyle who tracked down and help to provide the video footage discussed above from 61 Broadway (the building formerly where the Attorney Grievance Committee was located) for the Defendant Liebhauser and the Manhattan District Attorney's Office. Moreover, Defendant Doyle apparently spoke with Defendant Liebhauser, Defendant Yu and Defendant Doe on numerous occasions and provided them documents in an attempt to ensure Plaintiff was prosecuted and convicted.

73.     It further be noted that Defendant Doyle apparently acknowledged these facts to Plaintiff's former attorney, J. Richard Supple. In telephone calls to both Plaintiff and Plaintiff's father shortly after Plaintiff's release from Riker's, J. Richard Supple stated that he had seen Defendant Doyle in passing while at the Attorney Grievance Committee for another matter. According to J. Richard Supple, Defendant Doyle said to him:

> "Hey, did you hear we got your boy Zappin? He's really fucked this time, Cooper really made sure of it. I'd be surprised if he made it out of Riker's alive. He needs to learn a lesson. Tell him I said not to drop the soap!"

This comment clearly shows that Defendant Doyle was materially involved with Defendant Cooper and the Manhattan District Attorney's Office in the *People v. Zappin* matter.

### M.     Defendant Yu and Defendant Doe's Involvement

74.     So there is no confusion, Plaintiff brings this action against Defendant Yu and Defendant Doe solely for their actions with respect to Defendant Liebhauser's investigation, which they participated in and oversaw.

75.     Defendant Liebhauser's investigation was geared towards suppressing evidence favorable to Plaintiff, manufacturing evidence against him and attempting to entrap him during numerous telephone conversations, of which Defendant Yu and Defendant Doe participated. In other words, the investigation was initiated as as an act of retaliation against Plaintiff on

Defendant's Cooper behalf and as a result of Defendant Cooper's influence over the Manhattan District Attorney's Office.

76.     Furthermore, upon information and belief, Defendant Yu and Defendant Doe exercised influence over and coordinated with Defendant Liebhauser in filing the criminal complaint on March 28, 2017, which contained materially false and misleading statements.  (*See* Ex. 1, Criminal Complaint.)

N.    <u>Resolution of the Criminal Case</u>

77.     Without question, Defendant Cooper and the others participating in his scheme to retaliate against Plaintiff have financially crippled Plaintiff.  Plaintiff had been forced to expend hundreds of thousands of dollars in legal fees and costs the collateral proceedings Defendant Cooper has instigated against Plaintiff.  This was no different in the criminal proceeding.  Plaintiff was not only forced to hire counsel and post bail, but also hire a private investigator to locate relevant witnesses that Detective Liebhauser failed to interview or question.  A trial in the criminal proceeding would have cost Plaintiff no less than $40,000 in legal fees and costs, which Plaintiff simply could not afford.

78.     Furthermore, Plaintiff was fearful that he would not receive a fair trial if the matter went to a trial.  The District Attorney's Office stated that they intended to drop the charge to an attempt charge making it a Class B misdemeanor.  As a result, Plaintiff would not be entitled to a jury.  Thus, it would be a New York Criminal Court Judge deciding the credibility of his colleague on the New York County Supreme Court.  This would have been compounded by the fact that the District Attorney's Office stated that they intended to present Molineux Evidence against Plaintiff using Defendant Cooper's findings in the Custody Decision as well as attempting to litigate Plaintiff's allegations against Justice Kaplan in the Court of Claims complaint.  To put it simply,

any trial in the matter would have been unfairly and unconstitutionally stacked against Plaintiff.[9]
And, it would have cost tens of thousands of dollars in legal fees for motion practice to attempt to
get the case moved to a different venue, which would have likely been unsuccessful.

79.     In October 2017, the District Attorney's Office offered Plaintiff a plea deal.  The
District Attorney's Office was apparently afraid of placing Defendant Cooper on the stand and
subjecting him to cross-examination in light of the fact that his credibility and stature on the bench
was subject to substantial attack based on his fabrications in the Sanctions Decision and Custody
Decision.  The District Attorney's Office offered Plaintiff a deal that he would plea to a non-
criminal disorderly conduct violation where Plaintiff would not be required to make any admission
that he made a false police report.  In return, Plaintiff would do 21 hours of community service,
waive sealing of the disorderly conduct violation and agree to a two-year order of protection in
favor of Defendant Cooper.

80.     Because Plaintiff was financially crippled as a result of the unlawful actions of
Defendant Cooper and could not afford a trial coupled with the fact that Plaintiff was well-aware
that he was not going to get a fair trial in New York City Criminal Court for the reasons discussed
above, Plaintiff agreed to the deal.  Plaintiff plead guilty to disorderly conduct (a non-criminal
violation) on October 19, 2017.  Plaintiff has completed his community service and the matter is
now disposed.  Plaintiff's plea, however, has no effect on his claims in this matter.

---

[9] This same stunt was pulled against Dr. Eric Braverman by Justice Deborah Kaplan.  In 2014, Dr.
Braverman was arrested and charged with stealing court documents from Justice Kaplan's courtroom.  (*See*
http://nypost.com/2014/01/30/doctor-accused-of-stealing-court-documents-in-custody-fight/.)        The
District Attorney's Office dropped Dr. Braverman's charge to attempted petit larceny, a Class B
misdemeanor, that disposed of a jury trial.  Instead, Dr. Braverman was tried before a judge in which Justice
Kaplan took the stand and testified against him.  Without question, the trial was stacked against him, which
bore out in the verdict.  Dr. Braverman was found guilty and ordered to serve 15 days on Riker's Island.
Plaintiff certainly wanted to avoid this situation.

**COUNT I:**
**42 U.S.C. § 1983 – ABUSE OF PROCESS**
**(Defendants Cooper and Liebhauser)**

81.     Plaintiff re-alleges incorporates by reference paragraph 1 through 81 as if fully set forth herein.

82.     By and through their conduct, as described herein in this Complaint, and acting under color of state law, Defendant Matthew F. Cooper and Defendant Lauren Liebhasuer are liable to Plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's constitutional right to be free from court abusive and perverted use of lawful process under the Fifth and Fourteenth Amendments of the United States Constitution.

83.     Defendant Cooper and Defendant Liebhauser, acting under color of state law, employed regularly issued criminal process, which included and criminal complaint and a temporary order of protection in the *People v. Zappin* matter.

84.     Defendant Cooper and Defendant Liebhauser employed such process with the intent to cause Plaintiff harm.

85.     Defendant Cooper and Defendant Liebhauser employed such process for several collateral purposes, all of which are set forth above.

86.     As a direct and proximate result of Defendant Cooper's and Defendant Liebhauser's unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

**COUNT II:**
**42 U.S.C. § 1983 – CONSPIRACY TO ABUSE OF PROCESS**
**(All Defendants)**

87.     Plaintiff re-alleges incorporates by reference paragraph 1 through 86 as if fully set forth herein.

88.     By and through their conduct, as described herein in this Complaint, and acting under color of state law, Defendant are liable to Plaintiff under 42 U.S.C. § 1983 for the violation of Plaintiff's constitutional right to be free from court abusive and perverted use of lawful process under the Fifth and Fourteenth Amendments of the United States Constitution.

89.     Defendants, acting under color of state law, entered into an agreement whether express or in-fact to conspire to initiate a bogus investigation against Plaintiff with the intent of bringing criminal charges against him in retaliation for Plaintiff exercising his First Amendment freedoms.

90.     As part of this conspiracy, Defendant Cooper and Defendant Liebhauser, acting under color of state law, employed regularly issued criminal process, which included and criminal complaint and a temporary order of protection in the *People v. Zappin* matter.

91.     As part of this conspiracy, Defendant Cooper and Defendant Liebhauser employed such process with the intent to cause Plaintiff harm.

92.     Defendant Cooper and Defendant Liebhauser employed such process for several collateral purposes, all of which are set forth above.

93.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

**COUNT III:**
**42 U.S.C. § 1983 – RETALIATION FOR EXERCISING FREE SPEECH**
**(Defendants Cooper and Liebhauser)**

94.     Plaintiff re-alleges incorporates by reference paragraph 1 through 93 as if fully set forth herein.

95.     As set forth herein, Plaintiff exercised his First Amendment right to lawfully criticize Defendant Cooper, a public official.   Furthermore, Plaintiff exercised his First Amendment right to lawfully petition for redress against Defendant Cooper.

96.     Defendant Cooper and Defendant Liebhauser, acting under color of state law, brought criminal charges *People v. Zappin* against Plaintiff in retaliation for Plaintiff exercising his First Amendment rights.

97.     Defendant Cooper and Defendant Liebhauser denied Plaintiff his liberty by bringing criminal charges against him in retaliation for Plaintiff exercising his First Amendment Rights.

98.     As a direct and proximate result of Defendant Cooper's and Defendant Liebhauser's unlawful actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

**COUNT IV:**
**42 U.S.C. § 1983 – CONSPIRACY TO RETALIATE FOR EXERCISING FREE SPEECH**
**(All Defendants)**

99.     Plaintiff re-alleges incorporates by reference paragraph 1 through 98 as if fully set forth herein.

100.    As set forth herein, Plaintiff exercised his First Amendment right to lawfully criticize Defendant Cooper, a public official.   Furthermore, Plaintiff exercised his First Amendment right to lawfully petition for redress against Defendant Cooper.

101.    Defendants, acting under color of state law, entered into an agreement whether express or in-fact to conspire to initiate a bogus investigation against Plaintiff with the intent of bringing criminal charges against him in retaliation for Plaintiff exercising his First Amendment freedoms.

102.    Defendant Cooper and Defendant Liebhauser, acting under color of state law, brought criminal charges *People v. Zappin* against Plaintiff in retaliation for Plaintiff exercising his First Amendment rights.

103.    Defendant Cooper and Defendant Liebhauser denied Plaintiff his liberty by bringing criminal charges against him in retaliation for Plaintiff exercising his First Amendment Rights.

104.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff demands a jury on all issues which may be properly tried by a jury.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays that this Court:

(a)    Enter judgment in favor of Plaintiff against Defendants;

(b)    Enter judgment awarding Plaintiff compensatory damages on all counts herein seeking money damages to compensate Plaintiff for Defendants' activities complained of herein and for any injury complain of herein, inclusive of interest and costs, in an amount to be determined at trial;

(c)    Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

(d)    Enter judgment awarding Plaintiff his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

(e)    Order such other relief that the Court deems just and appropriate.

Dated: March 30, 2020
       Huntington, West Virginia

_____
ANTHONY ZAPPIN
1827 Washington Blvd.
Huntington, WV 25701
(304) 730-4463
anthony.zappin@gmail.com
*Plaintiff*